# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Rebecca R. Pallmeyer | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 02 C 4019 | **DATE** | 5/20/2003 |
| **CASE TITLE** | Rene Moreno, et al vs. DFG Foods, LLC | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m)   ☐ Local Rule 41.1   ☐ FRCP41(a)(1)   ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] Enter Memorandum Opinion And Order. The court grants Plaintiff's motion (Doc. 19-1) and hereby certifies a class consisting of all employees of DFG Foods as of January 18, 2002, except those employees who have released their claims against DFG.

(11) ■ [For further detail see order attached to the original minute order.]

| | | |
|---|---|---|
| | No notices required, advised in open court. | |
| | No notices required. | |
| ✓ | Notices mailed by judge's staff. | |
| | Notified counsel by telephone. | |
| | Docketing to mail notices. | |
| | Mail AO 450 form. | |
| | Copy to judge/magistrate judge. | |

| ETV | courtroom deputy's initials | |

2
number of notices

MAY 2 2 2003
date docketed

AR
docketing deputy initials

5/20/2003
date mailed notice

ETV
mailing deputy initials

**Document Number**

49

Date/time received in central Clerk's Office

FILED FOR DOCKETING

| | | |
|---|---|---|
| RENE MORENO, HERIBERTO URIBE, JOSE MANUEL URIBE, | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | No. 02 C 4019 |
| DFG FOODS, LLC, a subsidiary of Foodbrands America, Inc., | ) ) ) | Judge Rebecca R. Pallmeyer |
| Defendant. | ) ) | |

**MEMORANDUM OPINION AND ORDER**

Plaintiffs Rene Moreno, Heriberto Uribe, and Jose Manuel Uribe filed this class action against their former employer DFG Foods, L.L.C. (hereinafter "DFG" or "Defendant"). Plaintiffs allege that Defendant failed to provide Plaintiffs with sixty days' advance notice of termination in connection with Defendant's closing of a production plant on or about January 18, 2002. This failure, Plaintiffs assert, violated the Worker Adjustment and Retaining Notification Act ("WARN"), 29 U.S.C. §§2101 *et seq.* On October 17, 2002, Plaintiffs filed a motion for certification of a class consisting of all employees of Defendant as of January 18, 2002, who were not given the required sixty-day notice prior to the plant closing. For the reasons set forth below, the motion is granted.

**BACKGROUND**

In ruling on certification, the court has an independent duty to scrutinize the appropriateness of a class action and is not limited to arguments made by the parties. *In re General Motors Corp. Engine Interchange Litigation*, 594 F.2d 1106, 1124 (7th Cir. 1979). The court is not to assume the truth of factual allegations in the complaint that go to the issue of class certification, but rather, as would be true on a motion to dismiss for lack of jurisdiction, should resolve factual issues related to certification using any rational mode of inquiry. *Szabo v. Bridgeport Machs., Inc.*, 249 F.3d 672, 675-77 (7th Cir. 2001). *See Coopers & Lybrand v. Livesay,* 437 U.S. 463, 469 (1978) ("the class

determination generally involves considerations that are enmeshed in the factual and legal issues comprising the plaintiff's cause of action.") (internal quotation marks omitted). In considering this motion, the court has summarized facts taken from the Plaintiffs' Complaint and Defendant's Answer, documentary evidence submitted by the parties, and excerpts of depositions taken during the course of discovery in this case.

DFG is a subsidiary of Foodbrands America, Inc., which is in turn a subsidiary of Tyson Foods, Inc. (Complaint ¶ 7.) Until January 18, 2002, DFG maintained a food processing plant at 550 West 14th Place, in Chicago, Illinois. (Id.) Plaintiffs Rene Moreno, Heriberto Uribe, and Jose Manuel Uribe all worked for DFG at the 550 West 14th Place location. (Id. ¶ 10.) Rene Moreno was employed as a "food preparer," and as of January 18, 2002, earned $13.52 per hour at the DFG plant. (Id. ¶ 4.) Heriberto Uribe was a "production worker" at DFG, for which he earned $9.00 per hour. (Id. ¶ 5.) It is undisputed that Jose Manuel Uribe earned $12.00 per hour, and while he claims he was a "mixer," and Defendant claims he was employed as a "lead," (Id. ¶ 6; Answer ¶ 6) this dispute appears immaterial to the class certification motion (nor is the court aware of the meaning of these job titles or the difference between them, if any).

In the morning of January 18, 2002, Mark Easter, DFG's Senior Vice President of Operations and Technical Services, held a meeting with the DFG employees at 550 West 14th Place. (Rene Moreno Deposition (hereinafter "Moreno Dep.") at 33-34, Ex. B to Defendant's Brief in Opposition to Plaintiffs' Motion for Class Certification (hereinafter "Def. Brief"); Def. Brief at 2.) All three Plaintiffs attended the meeting. (Moreno Dep. at 33; Deposition of Heriberto Uribe (hereinafter "H. Uribe Dep.") at 29, Ex. A to Plaintiffs' Reply to Def. Brief (hereinafter "Pl. Reply"); Deposition of Jose Manuel Uribe (hereinafter "J. Uribe Dep.") at 33, Ex. A to Pl. Reply.) During the meeting, Easter announced that DFG was immediately and permanently closing the plant at 550 West 14th Place in order to consolidate the facility's operations with its Culinary Foods plant, located at 4201 S. Ashland Avenue, also in Chicago. The Culinary Foods plant is another food

preparation facility operated by Tyson Foods. (Complaint ¶ 10; Def. Brief at 2.) Easter indicated to the DFG employees that they would be offered the opportunity to work at the Culinary Foods plant (Moreno Dep. at 33-37; Def. Brief at 2), but he did not provide specific information about wages or whether people would retain the same job responsibilities. He explained only that salaries would be set according to the union at Culinary Foods. (Moreno Dep. at 36.)

At the meeting, DFG employees at 550 West 14th Place were handed written notice of the plant's closure. (Complaint ¶ 10.) Plaintiffs and other DFG employees received a letter from Cynthia LeBron, Human Resource Manager for DFG, stating in full:

January 18, 2002

Dear DFG Team Member:

We regret to inform you that DFG Foods, L.L.C., a member of the Tyson Foods family, intends to permanently discontinue all manufacturing and distribution operations at its plant located at 550 W. 14th Place, Chicago, Illinois, effective January 18, 2002. The only activities taking place in the plant thereafter will be the dismantling and removal of equipment.

Much of the production heretofore performed at the plant will be transferred to the Tyson Foods, Inc. facility, dba Culinary Foods in Chicago. Please accept this letter as your formal notice that you are hereby being offered the opportunity to transfer to the Culinary Foods plant located at 4201 South Ashland Avenue in Chicago, Illinois, within reasonable commuting distance from the 14th Place DFG plant.

You should be aware that Culinary Foods' production and maintenance employees are represented, for purposes of collective bargaining, by the Production and Maintenance Union, Local 101. Should you accept the opportunity for transfer to the Culinary Foods plant, your job classification assignment, wages, benefits and all other terms and conditions of employment will be subject to negotiation and agreement with the Union.

Should you accept the opportunity for transfer to the Culinary Foods plant, it is anticipated that your active employment at that plant would commence as soon as March, 2002 but, in any event, no later than within six (6) months following the Production Cessation Date of January 18, 2002.

The Company official to contact for further information concerning these matters is:

Cynthia LeBron
Human Resource Manager
DFG Foods, LLC
111 N. Canal, Suite 1111
Chicago, IL 60606-7204

3

(312) 279-1327

(Letter to DFG Employees of January 18, 2002, Ex. A to Def. Brief.) Plaintiffs do not dispute that they received this letter on January 18, 2002, after the meeting with Easter, nor is it disputed that Plaintiffs had been given no notice prior to January 18, 2002 that the plant would be closing. (Complaint ¶ 10.)

About one month after the plant closed, DFG began contacting former 550 West 14th Place employees by phone and offering them new positions at the Culinary Foods plant. (Cynthia LeBron Deposition (hereinafter "LeBron Dep.") at 133, Ex. A to Pl. Reply.) Cynthia LeBron, the Shift Human Resources Manager for Culinary Foods, was primarily responsible for placing these calls. (*Id.* at 133-34.) According to LeBron, once she received notice of job openings from the various managers at the Culinary Foods plant, she or one of her assistants would begin to contact the appropriate employees from the closed DFG plant, and offer them positions. (*Id.* at 136.)

In late February or early March 2002, Moreno received a phone call from a Culinary Foods representative informing him that he should report to work at the Culinary Foods cafeteria on the following Monday. (Moreno Dep. at 48.) During the call, Moreno did not ask and was not informed of what his job duties or wages would be at Culinary Foods. (*Id.* at 49.) Moreno testified that when he arrived to work at Culinary Foods a few days later, LeBron informed him that his rate of pay would be $6.40 per hour plus a 20 cent bonus for working a second shift. (*Id.* at 58, 60.) Defendant admits that Moreno was offered a job in the production department, but denies that he was offered $6.40 per hour (Defendant does not state what hourly wage he was offered). (Answer ¶ 13.) Moreno stated that LeBron told him that he would not have any benefits and that Culinary Foods was not honoring the seniority status of former DFG employees. (Moreno Dep. at 58.) Dissatisfied with the much lower rate of pay than he had been earning at DFG, Moreno declined the employment offer at Culinary Foods. (Complaint ¶ 13.)

Approximately two months after the DFG plant closed (the record does not identify the

4

precise date), Heriberto Uribe also received a phone call from a Culinary Foods representative who offered him a sanitation job at Culinary Foods. (H. Uribe Dep. at 52-53.) In their motion for class certification, Plaintiffs state that the offer was for $6.40 per hour, but Heriberto Uribe testified at his deposition that he was offered $5.15 per hour and was told he would have to work the night shift. (Heriberto Uribe Dep. at 54, 62.) Like Moreno, Heriberto Uribe declined the offer to work at Culinary Foods because he was not satisfied with the proposed pay. (Complaint ¶ 13.) Defendant denies that Heriberto Uribe was offered $6.40 per hour, but again does not state how much he was offered to work at Culinary Foods. (Answer ¶ 13.)

Jose Manuel Uribe was also given an offer to work in sanitation at Culinary Foods, though the timing of his offer is not clear from the record. (Complaint ¶ 13.) Plaintiffs claim he was offered $6.40 per hour, but declined the job because it represented a reduction of $5.60 per hour from his pay at DFG. (Id. ¶¶ 6, 13.) Defendant disputes that he was offered $6.40 per hour, but, as with Moreno and Heriberto Uribe, does not state the wage he was offered. (Answer ¶ 13.)

It is undisputed that as of January 18, 2002, DFG employed 266 workers at its plant on West 14th Place. (Def. Brief at 3.) Of those 266 workers, all but eight were offered a transfer to the Culinary Foods plant. (Id.) According to DFG, each of these eight employees was offered, and accepted, a separation package which included a release of all potential claims against DFG. (Id. at 3.) It is also undisputed that approximately 160 out of the remaining 258 employees did accept job transfer offers to the Culinary Foods plant. Their proposed rates of pay and other terms and conditions of employment at Culinary Foods were governed by the existing collective bargaining agreement between the Local 101 of the Production and Maintenance Union and Culinary Foods. (Def. Brief at 3, 4; Plaintiff.'s Memorandum in Support of Class Certification (hereinafter "Pl. Brief") at 4.) LeBron acknowledged that only a "few" DFG employees were hired at positions other than entry level at Culinary Foods, and none of the DFG employees enjoyed the seniority they had previously held, except for the purposes of calculating vacation time. (LeBron Dep. at 137-38.)

5

Records submitted by both parties indicate that approximately 84% of those employees were offered lower hourly wages at the new plant than they earned at DFG. (Confidential DFG Team Member Job Information Records, Ex. C to Pl. Brief and Ex. E to Def. Brief.)

On June 5, 2002, Plaintiffs filed this action against DFG, alleging that the Defendant failed to provide Plaintiffs with sixty days advance notice of termination in connection with Defendant's closing of the plant on January 18, 2002, as required by the Worker Adjustment and Retraining Notification Act ("WARN"), 29 U.S.C. §§ 2101 *et seq.* Plaintiffs' estimated damages, without considering overtime, benefits, and other possible add-ons, amount to $6,500 for Moreno, $5,800 for Jose Manuel Uribe, and $4,300 for Heriberto Uribe. (Pl. Brief at 8.) The court notes that these quantities roughly reflect the amount the Plaintiffs would be owed for 60 days backpay, based on an eight hour workday. 29 U.S.C. § 2104. On October 17, 2002, Plaintiffs filed this motion seeking certification of a class defined as "all employees of Defendant's facility located at 550 W. 14th Place, Chicago, Illinois as of January 18, 2002 who were not given the sixty day notice prior to the plant closing." (Plaintiffs' Motion for Class Certification at 2.) Defendant argues that class certification is improper because Plaintiffs have not made the showings necessary under Federal Rule of Civil Procedure 23 for class certification. (Def. Brief at 1.) Defendant maintains, first, that WARN does not apply here because the workers were offered transfers to the Culinary Foods plant. As Plaintiffs assert, however, even where such offers were made, it may be possible to view Defendant's conduct toward its workers as a "constructive discharge," meaning that the job transfers would not afford Defendant a shield from WARN liability. In *Int'l Oil, Chemical & Atomic Workers, Local 7-517 v. Uno-Ven Co.,* where defendant transferred ownership of an oil refinery in alleged violation of the WARN Act and a collective bargaining agreement, Judge Posner observed:

> We may assume without having to decide that here as elsewhere the concept of constructive termination . . . is available to prevent such shenanigans as offering to rehire the workers at a wage so much lower than their previous wage, or on conditions so much inferior, as to rebut an inference of continuity of employment. Obviously not every change in the terms and conditions of work is an 'employment

6

loss' . . . but 'employment loss' is defined to include a termination, and termination presumably includes constructive termination.

170 F.3d 779, 784 (7th Cir. 1999) (citations omitted). In response to the suggestion that constructive discharge may be a factor in this action, Defendant contends that because the issue of whether DFG employees were constructively discharged will require individualized analysis, the case is not suitable to be tried as a class action. (Def. Brief at 1.)

## DISCUSSION

Federal Rule of Civil Procedure 23 requires that as soon as practicable after the action commences, the court shall determine whether the action may proceed as a class action. The Rule explains that a class certification order "may be made conditional, and may be altered or amended before a final decision on the merits of the action is made." FED. R. CIV. P. 23(c). Plaintiffs bear the burden of demonstrating that their case meets the requirements of Rule 23. *General Telephone Co. of Southwest v. Falcon,* 457 U.S. 147, 156 (1982); *Williams v. Chartwell Fin. Servs., Ltd.,* 204 F.3d 748, 760 (7th Cir. 2000). Rule 23 sets forth four requirements for class certification: (1) that the class is so numerous that joinder of all members is impracticable; (2) that there are questions of law or fact common to the class; (3) that the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) that the representative parties will fairly and adequately protect the interests of the class. FED. R. CIV. P. 23(a). In addition to meeting these requirements, Plaintiffs must demonstrate that common questions of law and fact predominate over questions involving individual members, and that a class action is superior to other forms of adjudication.[1] FED. R. CIV. P. 23(b)(3).

DFG argues that the proposed class does not meet any of Rule 23(a)'s requirements, nor

---

[1]     Although Plaintiffs initially sought to certify the class under either Rule 23(b)(2) or (b)(3), Plaintiffs have subsequently abandoned their Rule 23(b)(2) claim. (Pl. Reply at 2, n. 2.) Therefore, the court will only analyze Plaintiffs' motion under 23(b)(3), after first considering the requirements of 23(a).

the requirement of Rule 23(b)(3) that common issues of law and fact predominate over individual ones. In the alternative, DFG argues that at the very most, only those employees who did not accept the transfer offers can be members of the class (of the approximately 260 DFG employees who were offered transfers, 160 accepted their offer, leaving approximately 100 who declined their offer to work at Culinary Foods). As a preliminary matter, the court notes that while Plaintiffs do not clarify the issue in their motion for class certification, the court assumes that the proposed class does not include the eight individuals who signed a waiver agreeing not to sue DFG.

Various provisions of the WARN Act set out the "common questions of law" necessary for class certification, and therefore the court briefly summarizes the nature and purpose of the statute. WARN requires that any business enterprise that employs 100 or more employees, excluding part-time employees, give sixty days' advance warning before any "plant closing" or "mass layoff." 29 U.S.C. §§ 2101 et seq. WARN provides employees who have suffered an "employment loss" without this warning the opportunity to receive compensation for their improper termination. Kelly v. SabreTech, Inc., 195 F.R.D. 48, 52 (S.D. Fla. 1999) (citations omitted). By its terms, WARN provides for a private right of action for aggrieved employees, and also contemplates that a representative of employees or a unit of local government aggrieved by the layoff or plant closing may sue on behalf of an individual or a group of similarly situated individuals who have suffered an employment loss. 29 U.S.C. § 2104(a)(1), (5). The statute provides further that an employee may not be considered to have experienced an employment loss if, prior to the plant's closing, the employer offers to transfer the employee to a different employment site. 29 U.S.C. § 2101(b)(A).

Defendant acknowledges the requirements of WARN, but urges they are not applicable here, where each employee was offered substitute employment at the Culinary Foods location. Plaintiffs urge that the transfer offers do not defeat their claims in this case. Under WARN Act regulations, offers to transfer employees to different locations upon the relocation or consolidation of an employer's business or offers to reassign workers at risk of termination or layoff still result

8

in employment losses where such offers constitute constructive discharges. *See Local 819, Int'l Brotherhood of Teamsters, AFL-CIO v. Textile Deliveries, Inc.*, No. 99CIV.1726 (JGK), 2000 WL 1357494, *5 (S.D.N.Y. Sept. 20, 2000), citing 20 C.F.R. § 639.3(f)(2); 20 C.F.R. § 639.5(b)(2)(2000). Where employees are rehired into inferior positions under unfavorable terms and conditions, such rehirings may also lead to employment losses. *Id.* Because Plaintiffs and the proposed class members were offered jobs at the Culinary Foods plant, to prevail here they will have to show that they were constructively discharged or that the transfer offers do not defeat their claims because the offers were not made prior to the DFG plant closing. With these principles in mind, the court now turns to the requirements of Rule 23.

## A.    Rule 23(a)

### 1.    Numerosity

To satisfy this requirement, Plaintiffs need only demonstrate that the proposed class is so numerous that joinder of all members is impracticable. FED. R. CIV. P. 23(a)(1). Judicial economy and the ability of class members to initiate individual suits are proper considerations in determining whether joinder is impracticable. *Patrykus v. Gomilla*, 121 F.R.D. 357, 360-61 (N.D. Ill. 1988). As at least one court has noted, "[t]he WARN Act seems particularly amenable to class litigation. By its terms, WARN is applicable only in the context of employer action which affects a large number of employees. It is only applicable to companies which employ more than 100 employees." *Finnan v. L.F. Rothschild & Co., Inc.*, 726 F.Supp. 460, 465 (S.D.N.Y. 1989) (Leval, J.). Numerous courts interpreting WARN have concluded that a class of approximately 100 is sufficient to satisfy numerosity. *See, e.g., Carrier v. JPB Enterprises, Inc.*, 206 F.R.D. 332, 334 (E.D. Me. 2002) (numerosity requirement for class action on behalf of employees terminated from employment due to plant closing or mass layoff was met where number of individuals with actionable claims exceeded 40, and for one claim was 123); *Ciarlante v. Brown & Williamson Tobacco Corp.*, Civ.

A. No. 95-4646, 1995 WL 764579, at *2 (E.D. Pa. Dec. 18, 1995) (120 class members); *Cruz v. Robert Abbey, Inc.*, 778 F.Supp. 605, 612 (E.D.N.Y. 1991) (114 class members).

Defendant urges that the class members here are readily identifiable, rendering joinder feasible and practical. The court does not agree. *Danis v. USN Communications*, the securities fraud case cited by Defendant for the proposition that joinder is not impracticable when class members are readily identifiable, involved a proposed class of 15 major brokerage firms. 189 F.R.D. 391, 399 (N.D. Ill. 1999). The case before this court involves approximately 260 food services workers presumably with much smaller damages claims than the 15 firms in *Danis.* Nor does the court find the other cases cited by Defendant persuasive, for each presents a factual situation quite different from this one. *See Marcial v. Coronet Ins. Co.*, 880 F.2d 954, 957 (7th Cir. 1989) (affirming denial of class certification in RICO suit for failure to meet numerosity requirement because plaintiffs failed to establish proposed class would have legitimate claims); *Primavera Familienstiftung v. Askin*, 178 F.R.D. 405, 409-11 (S.D.N.Y. 1998) (plaintiffs did not establish that joinder was impracticable in securities fraud actions because a multiplicity of lawsuits could not be avoided even if court certified class, and the financial resources of potential class members made joinder practical); *Hum v. Dericks*, 162 F.R.D. 628, 634-35 (D. Hawaii 1995) (impracticability of joinder not demonstrated in a medical malpractice case where medical records could easily identify the persons who had surgical implant of ligaments). The court therefore concludes that joinder of all members here is impracticable, especially since the proposed members' limited economic resources make it unlikely that separate actions would be brought if the Plaintiffs' motion were denied. *Cruz*, 778 F.Supp. at 612 (citation omitted).

Finally, the court notes that if a class certification order were to exclude the 160 employees who accepted their transfer offers, as Defendant urges, approximately 100 would remain, a number that by itself satisfies the numerosity requirement. Although there is no magic number of class members required to find numerosity, a class of 40 has generally been found sufficient to satisfy

Rule 23(a)(1). *See Swanson v. American Consumer Industries, Inc.,* 415 F.2d 1326, 1333, n. 9 (7th Cir. 1969) (noting that 40 class members is a sufficiently large group to satisfy Rule 23(a)); *Steinbrecher v. Oswego Police Officer Dickey,* 138 F.Supp.2d 1103, 1106 (N.D. Ill. 2001) (noting the same and certifying class with potentially hundreds of persons), citing *Ringswald v. County of DuPage,* 196 F.R.D. 509, 512 (N.D.Ill. 2000) (noting same and certifying class with potentially at least 40 members). *See also* Herbert Newberg, NEWBERG ON CLASS ACTIONS §§ 3.05 at 3-25 (3rd ed. 1992) (noting that a class of more than 40 individuals raises a presumption that joinder is impracticable.)

### 2. Commonality

Showing that the claims of the class members share a "common nucleus of operative fact" is usually sufficient to satisfy the commonality requirement under Rule 23(a)(2). *Keele v. Wexler,* 149 F.3d 589, 594 (7th Cir. 1998). Here, the claims all arise out of the closure of the DFG plant on January 18, 2002. "Common nuclei of fact are typically manifest where . . . the defendants have engaged in standardized conduct towards members of the proposed class . . . ." *Id.* In this case the common questions include whether Defendant's actions triggered the sixty-day notice requirement; whether Defendant offered class members the opportunity to transfer to the Culinary Foods plant prior to the closing of the DFG plant; whether statutory exceptions to the notice requirement apply; whether Defendant failed to provide notice as required; and whether proposed class members suffered an employment loss.

Defendant argues that the fact that some of the DFG employees accepted their offers to work at Culinary Foods, while others did not, raises serious questions about the proposed class members' commonality. The court agrees that whether transfer offers were accepted will be a factor in the constructive discharge analysis, and therefore some individual questions will need to be answered. There are, however, several factual issues that are common to all of the former DFG

11

employees as well, and therefore the court is not persuaded that the commonality requirement has not been met. Predominance of common issues of law and fact is not required under this section of the Rule; if it were, section 23(b)(3) would arguably be rendered superfluous. *See City Partnership Co. v. Jones Intercable, Inc.*, 213 F.R.D. 576, 582 n. 1 (D. Colo. 2002). Plaintiffs assert that Defendant violated WARN not only by failing to provide advance notice of the plant closing, but also by failing to make transfer offers prior to closing the plant. *See* 29 U.S.C. 2101(b)(2)(A) ("an employee may not be considered to have experienced an employment loss if the closing or layoff is the result of the relocation or consolidation of part or all of the employer's business and, *prior* to the closing or layoff – (A) the employer offers to transfer the employee to a different site of employment . . .") (emphasis added). Whether Defendant made an offer for transfer to the DFG employees prior to the plant closing is a question common to all potential class members, and is one of the major legal issues raised by Plaintiffs. The court reserves the possibility of eventually creating subclasses or making other appropriate alterations to the class based on evidence presented in the course of litigation. The court notes additionally that class members may choose to opt out of the class at their discretion. *See* FED. R. CIV. P. 23(c)(2)(A) ("the court will exclude the member from the class if the member so requests by a specified date"). At this point, however, the court feels it would be premature to exclude all 160 members of the potential class who accepted their offers of employment at Culinary Foods.

### 3. Typicality

Whether the Plaintiffs' claims are typical of those of the class members they represent is closely related to the commonality inquiry. *Keele*, 149 F.3d at 595 (citation omitted). A "plaintiff's claim is typical if it arises from the same event or practice or course of conduct that gives rise to the claims of other class members and his or her claims are based on the same legal theory." *Id., quoting De La Fuente v. Stokely-Van Camp, Inc.*, 713 F.2d 225, 232 (7th Cir. 1983) (additional

12

citations and internal quotation omitted). It is only necessary for the claims of the named plaintiffs and the claims of the class at large to have the "same essential characteristics," and the existence of some factual differences will not always preclude class treatment. *Retired Chicago Police Ass'n v. City of Chicago*, 7 F.3d 584, 596-97 (7th Cir. 1993) (citation omitted).

Defendant argues that Plaintiffs' claims are not typical if proving them does not necessarily prove all the proposed class members' claims. *See Calkins v. Fidelity Bond and Mortgage Co.*, No. 94 C 5971, 1998 WL 719569, at *2 (N.D. Ill. Oct. 8, 1998) (citation omitted). In addressing this argument, the court notes that more than one claim may be at issue here. With respect to the claim that Defendant failed to make transfer offers prior to the DFG plant's closure, as well as the claim that Defendant did not notify the DFG employees of the closure until the day the plant closed, based on the evidence currently in the record (showing that the DFG employees all received notice on January 18, 2002), it appears that proving the named Plaintiffs' claims will settle the issue for all class members. Defendant has not argued that some DFG employees were notified earlier than January 18, 2002 about the plant's closure, nor does Defendant contend that the transfer offers were made to some DFG employees prior to that date.

It is more likely that the court's analysis of the constructive discharge claim will require some individualized scrutiny. The court acknowledges the possibility that some of the workers who transferred to Culinary Foods prefer their new positions and would not pursue this case on their own, or might even opt out if given the opportunity. The limited information before the court now, however, suggests that many or perhaps most of the workers who accepted new positions did so at much reduced pay and with a significant loss of seniority rights. To the extent that some persons accepted these positions for lack of any other alternative, there might still be an argument that they were constructively discharged from their employment and then took lesser-paying jobs because they were unable to find better ones. At this stage it is premature for the court to conclude that Plaintiffs' claims are not typical of the proposed class.

As mentioned earlier, shall it become necessary, the court will alter the class or create subclasses. Neither of these actions are necessary at this juncture, for the court concludes that Plaintiffs have satisfied the typicality requirement under Rule 23. Defendant has not disputed that its conduct toward the potential class members was more or less uniform. It is undisputed that Defendant informed all DFG employees of the plant's closing in the same manner and then over the next several months contacted DFG employees by phone about transferring to Culinary Foods. Having been treated in virtually the same manner by Defendant, the class now seeks to sue under a unified legal theory. In *Cruz v. Robert Abbey, Inc.,* a WARN Act case stemming from employee layoffs at Robert Abbey, a Brooklyn, New York manufacturer, and its successor, the court stated that although individual questions might arise depending on the date and nature of each employee's layoff, commonality still existed. 778 F.Supp. at 612. The court stated that it did "not view the application of the common legal issues in these actions to the plaintiff class – each of whom has already been laid off by Robert Abbey, Inc. [or its successor], and each of whom solely seeks compensatory damages and civil penalties under WARN – as making the plaintiffs' claims uncommon or atypical." *Id.*

In suggesting that the typicality requirement means that its conduct must affect each class member in precisely the same way, Defendant overstates the Rule 23 test. In *Cullen v. Margiotta,* a New York state court had denied certification to the same proposed class of current and former municipal employees who later brought a federal RICO and civil rights action against local political parties, alleging that defendant had coerced political contributions and unlawfully denied promotions and other employment benefits. 811 F.2d 698, 733 (2d Cir. 1987). *See Cullen v. Margiotta,* 81 Misc.2d 809, 810-11, 367 N.Y.S.2d 638, 641 (N.Y. Sup.1975). The Second Circuit affirmed an order refusing to decertify the class, noting that *res judicata* did not apply because the Rule 23 standard is more generous than the corresponding rule under New York law. Rule 23 "does not require that plaintiffs seek to redress a common wrong perpetrated against the class as

14

a class. Rather, certification of a class under Rule 23 is usually warranted when individual wrongs are alleged to have been pursuant to a common plan." *Id.* 811 F.2d at 733 (citations omitted). The court concludes that Rule 23(a)(3) is satisfied here, as well.

## 4. Fair and Adequate Representation

To satisfy the fourth requirement under Rule 23(a)(4), the named plaintiffs must: (1) not have claims which are antagonistic to or conflict with those of the other class members; (2) have sufficient interest in the outcome of the case to ensure vigorous advocacy; and (3) have competent and experienced attorneys that are generally able to conduct the litigation vigorously. *Gammon v. GC Services Ltd. Partnership*, 162 F.R.D. 313, 317 (N.D. Ill. 1995) (citations omitted).

The court sees no basis for concluding that Plaintiffs have interests which are adverse to other members of the class. *See Rosario*, 963 F.2d at 1018 ("[a] class is not fairly and adequately represented if class members have antagonistic or conflicting claims.") (citation omitted). Defendant points out that "a class representative who has suffered no injury is not an adequate representative," *Centurions v. Ferruzzi Trading Intern., S.A.*, No. 89 C 7009, 1994 WL 114860, * 11 (N.D. Ill. 1994) (citations omitted), and argues that because Plaintiffs cannot establish they were constructively discharged, they are not adequate class representatives. In this court's view, Defendant's argument assumes that the named Plaintiffs must prove the merits of their case before the court will grant class certification. The law does not impose such a requirement. The court notes that with respect to the Plaintiffs' claims, Defendant is apparently suggesting that they are not tantamount to constructive discharge. Based on what the court now knows--for example, that Moreno's pay would have been cut by nearly 50% at Culinary Foods, and his seniority status eliminated--the court is satisfied that these Plaintiffs have colorable claims that they did suffer a job loss within the meaning of WARN. At this point in the litigation, Defendant has offered no evidence showing that Plaintiffs did not suffer injury as a result of the DFG plant closure, and therefore

Plaintiffs are deemed adequate class representatives.

To determine whether class counsel is qualified, courts look to the professional qualifications, skills, experience and resources of counsel. *Armstrong v. Chicago Park District*, 117 F.R.D. 623, 630-31 (N.D. Ill. 1987). Plaintiffs' attorneys have acted as class counsel in several civil rights cases, including *Miller v. Spring Valley Properties*, 202 F.R.D. 244 (C.D. Ill. 2001); in 1993, *Johnson v. Reno*, in the Federal District Court for the District of Columbia (there are no opinions of the court available); *Dyer-Neely v. City of Chicago*, 101 F.R.D. 83 (N.D. Ill. 1984); *Concerned Tenants Ass'n of Indian Trails Apartments v. Indian Trails Apartments*, 496 F. Supp. 522 (N.D. Ill. 1980). Counsel also represented a class of 1100 in a Fair Labor Standards Act case against the City of Chicago, *Tracy v. City of Chicago*, No. 95 C 5714 (the court was not able to locate an opinion in this case). Defendant does not dispute counsel's litigation experience, nor does Defendant argue that counsel is not qualified for any other reason. For these reasons the court concludes that Plaintiffs have met the requirements of Rule 23(a).

**B.     23(b)(3)**

Rule 23(b)(3) imposes the additional requirement that common questions of law and fact predominate and that a class action is the superior method for adjudicating the plaintiffs' claims. The court concludes this requirement has also been met. Determining liability in this case will likely depend on the resolution of several common questions regarding the events that transpired at the 550 West 14th Place facility, and how the WARN Act liability provisions should (or should not) be applied to those circumstances. As stated in Rule 23(b)(3):

> The matters pertinent to the findings include: (A) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; (D) the difficulties likely to be encountered in the management of a class action.

FED. R. CIV. P. 23(b)(3). The court is not aware of the existence of any other WARN or related

litigation involving DFG's closure of the 550 West 14th Place plant. The claims of individual employees are likely to be rather small, and it is likely that the costs of litigation would preclude most individual employees from bringing such an action. *Kelly*, 195 F.R.D. at 54. Plaintiffs' potential damages, ranging from $4,300 to $6,500 each, are small enough to make separate and individual claims impractical. Courts have recognized individual claims as high as $10,000 as "relatively small, making it difficult for the individual class members to institute individual claims." *Schmitt v. United States*, 203 F.R.D. 387, 391, 401 (S.D. Ind. 2001); *see also O'Brien v. Encotech Const. Services, Inc.*, 203 F.R.D. 346, 350-51 (N.D. Ill. 2001) (certifying a class where individual claims were between $3,000 and $8,000). Furthermore, the court has not been presented with evidence of difficulties relating to management of this action as a class action.

Defendant argues that individual issues predominate over common ones, thus making the case inappropriate for class action status. Specifically, Defendant states that because each class member will have to prove he was constructively discharged, the court will be required to delve into each member's circumstances to make this determination. In this court's view, however, the issue of whether the class members suffered an employment loss does involve some common questions. For example, section 2101(b)(2)(A) states that employees will be found not to have experienced an employment loss if Defendant offered them transfers before the plant closing. Defendant will undoubtedly argue that it did so; that the letters given out and the meeting held on January 18, 2002, constituted an offer to DFG employees to transfer to Culinary Foods. Defendant does not contend that prior to the plant closing, it treated any of the proposed class members differently from each other. Therefore, the determination of whether the employees suffered a loss of their employment at DFG will not require the court to delve into individualized questions.

It is true that the issue of whether employees were constructively discharged may pose individualized questions. For example, the court may need to compare salaries and job responsibilities at DFG and Culinary Foods to determine whether employees were given

17

comparable job offers within the meaning of WARN. Defendants cite *Carpenters District Council of New Orleans v. Dillard Dept. Stores, Inc.*, 790 F.Supp. 663, 668 (E.D. La. 1992), *aff'd in part, rev'd in part on other grounds*, 15 F.3d 1275 (5th Cir. 1994), where notices of termination were given in April and May 1989 to employees of a department store who were discharged on various later dates in the spring and summer of that year. *Id.* at 665. Notably, however, before issuing the opinion on which Defendants rely, the court in that case had certified a class which included members who claimed to have been constructively discharged. *See Carpenters District Council of New Orleans v. Dillard Dep't Stores, Inc.*, CIV A Nos. 89-3680, 89-3751, 1990 WL 94221 (E.D.La. Jun. 28, 1990) (order approving form of class notice). In *Dillard*, after a trial on the merits showed that defendant was liable, defendant objected to the inclusion of certain class members on the grounds that they did not suffer an employment loss and thus were not entitled to damages. The court discussed circumstances involving each of the challenged class members individually to determine whether their inclusion in the class was proper, and ultimately decided that two of the four disputed class members were not constructively discharged (and therefore to be excluded from recovery). *Id.* at 669-72. Rather than establishing that the proposed class in this case should not be certified because of individual questions, *Dillard* instead demonstrates to this court that certification is proper even though it may become apparent down the line that certain class members did not suffer an employment loss and therefore are not entitled to any recovery. Notably, Defendant has not argued that any employees in particular should be excluded from class membership, and until the court is faced with specific reasons why an employee did not suffer an employment loss under WARN, the court will not prevent proposed class members from seeking relief under the Act.

The court recognizes Defendant's contention that its defenses may differ among individual employees. For example, the nature or timing of Defendant's offers for transfers may be relevant to the court's analysis of the case. The terms of the individual offers may also be relevant in

determining whether an employee was constructively discharged. The court concludes, however, that these issues are subordinate to the common issues and facts in this case. For example, Defendant asserts that it offered all but eight DFG employees the opportunity to transfer to a comparable job at the Culinary Foods plant and thus did not violate the WARN Act, while Plaintiffs assert that none of them were given offers of substitute employment before the plant's closure. Plaintiffs argue that the jobs they were offered after the plant closing were so inferior to their old positions that they amounted to a constructive discharge. Although damage awards, if any, will likely be class-member-specific, every calculation will be based on the same WARN Act provision that establishes damages equivalent to pay and benefits for the period of the violation. *See* 29 U.S.C. § 2104.

Defendant cites *Barreras Ruiz v. American Tobacco Co.* to support its proposition that DFG's due process rights to test the merits of each employee's claim would be violated if a class is certified. 180 F.R.D. 194, 198 (D. Puerto Rico 1998). In *Barreras Ruiz*, plaintiffs proposed and the court rejected a class consisting of all smokers in Puerto Rico; the estates, representatives, and administrators of Puerto Rico residents who were or are nicotine dependent cigarette smokers; and relatives, heirs, and survivors of Puerto Rico smokers. *Id.* at 195. The plaintiffs also requested that the court appoint medical monitors for the proposed group. Finally, plaintiffs proposed a bifurcated trial, in which the court would first decide the issue of whether nicotine is addictive and harmful and then in the event that issue were decided in favor of plaintiffs, a second phase in which individual plaintiffs would be permitted to assert their right to recovery. *Id.* In these second phase hearings, defendants would be free to raise issues of prior medical and family history, comparative negligence, statute of limitations, and assumption of risk, but plaintiffs proposed limiting defendants' expert testimony to one half-day per plaintiffs. Id. In denying the motion for class certification, the court noted that with the potential class of hundreds of thousands, if not millions of members, "[w]e infer that rather than try all these cases, plaintiffs' counsel is presuming that

defendants will scurry to settle subsequent to a first round loss," with the potential of depriving defendants of their due process right to a case-by-case determination. *Id.* at 198. The court does not agree with Defendant that this case poses similar problems as *Barreras Ruiz*. As opposed to a class of potentially hundreds of thousands, the class proposed by Plaintiffs here would number close to 260, and rather than being tied to each other based on their status as smokers, class members here all worked at the same food production plant, and were all affected in some way by the plant's closing on January 18, 2002. There is no evidence that Plaintiffs' motives in this case are to induce the Defendant to settle an unwieldy case; rather, the court concludes that a class action makes sense in light of the small potential damages for each class member.

The court finds that a class action is superior to other means of adjudication. If class certification is denied, it is probable that potential plaintiffs will forego their opportunity to litigate these issues because of the relatively low stakes involved. *Parker v. Risk Management Alternatives, Inc.*, 206 F.R.D. 211, 213 (N.D. Ill. 2002). Allowing these individuals to collectively litigate is therefore not only superior, it is likely to be their only opportunity to recover, should their claims prove meritorious.

## CONCLUSION

Upon consideration of the standards of Rule 23(a) and (b)(3), the court concludes that class certification is proper in this matter. The court grants Plaintiff's motion (Doc. 19-1) and hereby certifies a class consisting of all employees of DFG Foods as of January 18, 2002, except those employees who have released their claims against DFG.

ENTERED:

Dated: May 21, 2003

REBECCA R. PALLMEYER
United States District Judge

20